MAYER S. TAPPER AND ELIZABETH N. TAPPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MONROE M. TAPPER AND ESTEE TAPPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tapper v. Commissioner
Docket Nos. 17346-82, 4736-83.
United States Tax Court
T.C. Memo 1986-597; 1986 Tax Ct. Memo LEXIS 9; 52 T.C.M. (CCH) 1230; T.C.M. (RIA) 86597; December 23, 1986. *9 Petitioner was a general partner in a limited partnership organized in order to construct a post office facility. The partnership was dissolved at the end of the year in issue. Petitioner reported a specially-allocated ordinary loss as his allocable share of partnership operating income or loss. The record failed to establish that all of the general partners had agreed to the special allocation, and did not establish that the general partners had agreed to some alternate procedure for modifying allocations of partnership income. Held, petitioners have not met their burden of proving that the special allocation was a modification agreed to by all the general partners or adopted in a manner prescribed by the partnership agreement. Sec. 761, I.R.C. 1954; Rule 142(a), Tax Court Rules of Practice and Procedure.
Although petitioner did not receive cash upon dissolution of the partnership, he was relieved of his allocable share of partnership liabilities when the United States Government purchased the post office facility and assumed its mortgage. The sale occurred several months before the partnership was dissolved. Held, sale of the post office facility and subsequent dissolution of *10 the partnership were two steps in an integrated transaction. Held further, petitioner is deemed to have received a distribution of "money" in liquidation of his partnership interest. Sec. 752(b), I.R.C. 1954. To the extent his basis in his partnership interest exceeds his allocable share of partnership liabilities assumed, he is entitled to deduct a loss. Sec. 731, I.R.C. 1954. The loss is considered to have been derived from the sale or exchange of the partner's interest in the partnership. Secs. 731, 741, I.R.C. 1954. Petitioner failed to keep account of his basis in his partnership interest during the 10 years of partnership operations. His capital account was $ (-241,235) at the beginning of the year in issue, and his allocable share of partnership liabilities was $1,756,552. Held, in this case, it is appropriate to calculate basis from capital account because when petitioner's share of partnership liabilities is added to his negative capital account, a positive number results. Held further, basis adjusted to reflect partnership interest acquired from another partner. Morris M. Sherman,Angela M. Bohmann, and Alan J. Wilensky, for the petitioners. Michael C. Cohen,Sue *11 A. Nelson,James M. Kamman, and Genelle F. Forsberg, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioners
Year
Deficiency
Mayer S. and Elizabeth
1978
$46,686
N. Tapper
Monroe S. and Estee
1977
183
Tapper
1978
70,757
1979
10,719
The issues for decision are: (1) whether a partnership agreement was modified to make a special allocation of ordinary loss, (2) if so, whether the special allocation had substantial economic effect, and (3) whether respondent properly calculated the amount and character of gain or loss upon dissolution of the partnership. FINDINGS OF FACT This case was submitted fully stipulated pursuant to Rule 122. [1] The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners Mayer S. and Elizabeth N. Tapper, husband and wife, resided in Golden Valley, Minnesota when they filed their petition in this case. They timely filed a joint Federal income tax return for the calendar year 1978. Petitioners Monroe M. and Estee Tapper, *12 also husband and wife, resided in Beverly Hills, California when they filed their petition in this case. They timely filed joint Federal income tax returns for the calendar years 1977, 1978, and 1979. They filed an amended tax return for 1977 on January 9, 1980, and a second amended tax return for 1977 on August 25, 1980. The adjustments to the years 1977 and 1979 for petitioners Monroe M. and Estee Tapper relate to a carry-back of investment credit to 1977 and the benefits of income averaging for 1979. The adjustments are dependent on the outcome of the issues in dispute for 1978. In 1968, Kearny Post Office Associates (Kearny) was organized as a limited partnership under the laws of the State of New Jersey. The Articles of Limited Partnership state that the purpose of the partnership was "to acquire the fee title to certain unimproved real property located in Kearny, New Jersey, to cause to be constructed thereon a post office facility and to lease the facility to the United States Government." Petitioner Monroe M. Tapper (hereinafter Monroe) was a general partner in Kearny. He originally acquired a 3.75 percent interest in the profits and losses of the partnership and a 3.75 *13 percent ownership of the partnership's capital. Petitioner Mayer S. Tapper (hereinafter Mayer) acquired from Monroe a one-third interest in Monroe's partnership interest in Kearny. Petitioners' interest in Kearny hereinafter will be referred to as the Tapper partnership interest. Kearny's Articles of Limited Partnership were filed on November 7, 1968. Article 5 provided for the following allocation of partnership income and losses for Federal income tax purposes. (a) Until substantial completion of construction of the Facility * * *, the taxable income or loss of the partnership as determined and to be reported for Federal income tax purposes shall be allocated entirely to the limited partners. (b) After construction of the Facility is completed, the net income or loss of the partnership, as determined for Federal income tax purposes, shall be allocated, and the net cash receipts of the partnership * * * shall be distributed, one-half to the general partners and one-half to the limited partners. (c) Nothing contained in Article 5(a) and (b) shall be construed to require any limited partner to make any capital contributions to the partnership to restore any deficit after he has completed *14 the contributions required by the terms of Article 4. [Emphasis added.] Article 6 provided that allocations of income or loss among the limited partners were to be made in accordance with the limited partner's proportionate capital contribution.Allocation of these items among the general partners was to be made in accordance with "the definitive written agreement among the partners of Lincoln Rosen & Associates." Lincoln Rosen & Associates was one of Kearny's original general partners. No written agreement among the partners of Lincoln Rosen & Associates has been submitted as evidence in this case. Article 3 provided that the partnership was to dissolve upon the first to happen of the following events: (1) the death, bankruptcy, retirement or adjudication of insanity or incompetency of any general partner, or (2) the written decision of all of the general partners to dissolve the partnership, upon not less than 3 months' notice to all of the limited partners. The article further provided that the general partners agreed to make such decision upon the first to happen of the following events: (1) the termination by the Government of the lease; (2) the expiration of the lease without *15 renewal; (3) the purchase of the property by the Government, or (4) the sale or other disposition by the partnership of all or substantially all of its interest in the property. Article 18 provided that upon dissolution of the partnership, the general partners would proceed to liquidate the partnership. The proceeds of liquidation were to be applied and distributed in the following order of priority: (i) to pay partnership debts and liabilities, (ii) to set up reserves to meet contingent liabilities, (iii) to repay loans or advances made by the partners to the partnership, and (iv) to return one-half of the balance to the general partners, and one-half to the limited partners. The general partners were not personally liable for the return of capital contributions of the limited partners. Subsequently, after the adoption of several supplemental agreements not relevant to the issues before us, counsel for the general partners prepared a memorandum proposing a third supplemental agreement to the articles of limited partnership. The memorandum recited a variety of factors that had led to increased costs and delayed construction, including "a grand jury investigation into political activities *16 in Hudson and Essex Counties [which] had focused * * * on those employed in the construction of the Facility * * *." The memorandum proposed a supplemental agreement regarding tax allocations with the following explanation: Due to delays in constructing the Facility and exaggerated costs incurred * * *, the general partners had advanced to (or expended for) the partnership approximately $4,600,000 not anticipated upon formation of KPOA [Kearny]. In addition, * * * additional amounts approximating $2,400,000 will have to be advanced by the general partners is order to complete the Facility. When it became apparent to the general partners that their investment might be as much as $7,000,000 and that partnership losses incurred prior to USPS occupancy would far exceed the $4,000,000 estimated at the time of the execution of the Agreement, they engaged the undersigned as special counsel to advise in interpreting the provisions of the Agreement and explore the possibility of amending the Agreement to reflect changed circumstances. The limited partners retained separate legal counsel to represent them in negotiations for a change in tax allocations. On April 1, 1972, the partners adopted *17 a third supplemental agreement to the Articles of Limited Partnership. This agreement provided, in part, as follows: A. That net income or net losses of the partnership, as determined for Federal income tax purposes, shall be allocated as follows: (a) Until December 31, 1970, net losses shall be allocated entirely to the limited partners. (b) For the calendar year 1971, net losses shall first be allocated entirely to the limited partners until $1,221,500 of net losses has been so allocated, and, except as provided in Article 5A(d), all net losses in excess thereof shall be allocated one-half to the general partners and one-half to the limited partners. (c) For years beginning after December 31, 1971, such net income or net losses shall be allocated one-half to the general partners and one-half to the limited partners, except as provided in Articles 5A(d) and (e). On December 28, 1971, Seymour Rubin, a general partner who held 25 percent of the interests held by the general partners (or a 12.5 percent partnership interest), terminated his partnership interest in Kearny. The general partners agreed to release Rubin from all partnership liabilities in exchange for a contribution to *18 the partnership of $364,000, which would bring the balance of Rubin's capital account to $1,000,000, and an assignment of all of Rubin's interest in Kearny to general partners Russell, Gunter, and Monroe Tapper. After Rubin's partnership interest was terminated, the five remaining general partners had the following interest in partnership profits, losses, and capital: Interest in Profits,
General Partner
Losses, and Capital
Robert B. Russell
16.67%
William L. Gunter
16.67%
Monroe M. Tapper
7.92%
Charles P. Ballenger
5.00%
Lincoln Rosen
3.75%
50.00%
The limited partners held the remaining 50 percent interest in profits, losses, and capital. Kearny filed a U.S. Partnership Return of Income (Form 1065) for the calendar year 1978. The partnership return shows that as of January 1, 1978, the general partners had the following balances in their capital accounts: General
Capital Account
Partner
Balance
Russell
$ (555,417.30)
Gunter
(765,853.38)
Tapper
(241,234.78)
Ballenger
(310,712.11)
Rosen
(360,103.88) Although as of January 1, 1978, the general partners' capital account balances were negative, each partner's basis in his partnership interest was positive because the basis included, among other liabilities, the *19 secured liability on the post office facility. In August of 1978, Kearny sold the post office facility to the United States Government for a gross purchase price of $26,201,556.43 [2] which included cash of $4,022,866.88 and the assumption of the mortgasge on the property of $22,178,689.55. On August 28, 1978, the general partners notified the limited partners that the partnership would be dissolved as of December 27, 1978. By memo dated December 22, 1978, the limited partners were informed that the general partners intended to proceed with the dissolution of the partnership, and that partnership assets would be distributed on December 27 or 28. The partnership was subsequently dissolved on or before December 31, 1978. Prior to the dissolution on November 27, 1978, general partner Russell sent a letter to Monroe Tapper requesting additional funds to wind up the affairs of the partnership. The letter promised that any general partner required to contribute more than his proportionate share would be entitled to a special allocation of tax benefits equal to double the amount *20 of his excess contributions: Dear Monroe: As you know, this facility was sold on August 28, 1978 for $4,000,000. above the first mortgage balance. This selling price resulted in an estimated shortfall of $750,000. Each General Partner's share of the overall loss with respect to this project is indicated in the schedule below and I request that each of you forward your share to me immediately. Total Estimated
Total Capital
General Partner
Contributed
Amount
Capital Required
To Date
Due
Robert B. Russell
$1,870,682.24
$1,722,148.47
$148,533.77
William L. Gunter
1,870,682.24
1,511,712.39
358,969.85
Monroe Tapper
889,391.81
828,080.51
61,311.30
Charles Ballenger
561,256.61
380,071.53
181,185.08
Lincoln Rosen
157,903.00
157,903.00
Totals
$5,349,915.90
$4.599,915.90
$750,000.00
The foregoing request for funds is essential to winding up the affairs of the partnership. If it should become necessary for a general partner to contribute more than his proportionate share (as called for above) due to the failure of another partner or partners to contribute his full share, then he will be allocated additional 1978 ordinary deductions in an amount equal to double the amount of his excess contributions. For example, if a partner's *21 proportionate contribution was set at $50,000. and he instead contributed $70,000., his share of 1978 partnership loss for income taxes would be increased by 2 X ($70,000. - 50,000 = $20,000) or $40,000. The reverse of the foregoing would apply to a partner who is short of his required contribution. Please remit the required amount by December 12, 1978. If your contribution is not remitted in full by that date, I, as general partner will take it as implied consent to the principal [sic] of allocation stated above and will so reallocate partnership operating losses in the 1978 partnership K-1 forms. Monroe agreed to contribute more than his $61,311.30 share of the overall loss in exchange for a reallocation of partnership losses in accordance with Russell's letter. He paid $225,000 to Kearny on December 26, 1978, and agreed to assume $75,000 of partnership liabilities. The partnership liabilities assumed were specifically to include $60,000 due to Blue Chip Ventures. General partner Russell also paid $225,000 to the partnership and agreed to assume $75,000 in partnership liabilities. On their respective tax returns for subsequent years, Monroe and Mayer Tapper deducted as an ordinary *22 expense some of the $75,000 liabilities assumed pursuant to Russell's November 27, 1978 letter. The record contains no evidence that any of the other general partners received a letter from Russell similar to the November 27, 1978 letter sent to Monroe, nor is there evidence that any of the other general partners agreed to the allocation referred to in the letter. The accountant for the partnership prepared the following schedule showing, for each general partner, the estimated total capital required, the total capital contributed, the amount due, the amount contributed, and the amount of the contribution's excess, or shortfall: ESTIMATED TOTAL
TOTAL CAPITAL
GENERAL PARTNER
PERCENT
CAPITAL REQUIRED
CONTRIBUTED
Robert B. Russell
36.03
$1,870,682.24
$1,722,148.47
William B. Gunter
36.03
1,870,682.24
1,511,712.39
Monroe Tapper
17.13
889,391.81
828,080.51
Charles Ballenger
10.81
561,256.61
380,071.33
Lincoln Rosen
157,903.00
157,903.00
100.00 $5,349,915.90
$4,599,991.90 [sic]
AMOUNT
GENERAL PARTNER
AMOUNT DUE
CONTRIBUTED
OVER (SHORT)
Robert B. Russell
$148,533.77
$300,000.00
$151,466.23
William B. Gunter
358,969.85
(358,969.85)
Monroe Tapper
61,311.30
300,000.00
238,688.70
Charles Ballenger
181,185.08 [sic]
(181,185.08) [sic]
Lincoln Rosen
$750,000.00
$600,000.00
($150,000.00)
Based *23 on the amounts computed in the last column in the above schedule, the accountant for the partnership made the following computations to determine a "penalty gain" or "penalty loss" allocation to the general partners: "Penalty gain" allocation to general partners not contributing:
Gunter
$358,969.85 (shortfall listed above)
X         2
$717,919.16
(math error -
should have
been $717,939.70)
Ballenger
$181,185.08 (shortfall listed above)
X         2
$362,370.16
Total "penalty gain" allocation
$1,080,289.32
"Loss" allocation to the other general partners:
Total "loss" to be allocated equals
"penalty gain" allocated to non-con-
tributing partners as computed above
$1,080,289.32
Minus amount of "loss" allocated to
partner Rosen
23,161.32
[3] $23,161.32
Remainder of "loss" to be allocated
to contributing partners Russell and
Tapper
1,057,128.00 Percentage of allocation of remaining "loss" between Russell and Tapper: Russell
$151,466.23 (amount of overpayment listed above)
X         2
$302,932.46 = 38.83%
Tapper
$238,688.70 (amount of overpayment listed above)
X         2
$477,377.40 = 61.17%
$780,309.86 = 100.00%
"Loss" allocation to Russell - 38.83% of 1,057,128
410,495.36
"Loss" allocation to Tapper - 61.17% of 1,057,128
646,632.64
Total "loss" allocation
$1,080,289.32
For *24 1978, Kearny had an ordinary loss of $1,027,642.53 from operations. The amount of this operating loss allocated to the general partners was $684,661.24, and was allocated among them in accordance with the following table: % OF
PROFIT/LOSS
SHARING OF
"NORMAL"
"SPECIAL"
NET
GENERAL
ALLOCATION OF
ALLOCATION
ALLOCATION OF
GENERAL
PARTNERS'
GAIN/(LOSS)
OF GAIN/(LOSS)
GAIN/(LOSS)
PARTNER
50% SHARE
OPERATIONS
OPERATIONS
OPERATIONS
Russell
33.33
($228,197.59)
+
($410,495.36)
=
($638,692.96)
Gunter
33.33
( 228,197.59)
+
717,919.16 =
489,721.57 Tapper
15.84
( 108,450.34)
+
(646,632.64)
=
(755,082.99)
Ballenger
10.00
( 68,466.12)
+
362,370.16 =
293,904.04 Rosen
7.50
( 51,349.59)
+
(23,161.32)
=
(74,510.90)
100.00 ($684,661.24) [sic]
($684,661.24) The column headed "Normal Allocation of Gain/(Loss) Operations" is the allocation of the ordinary loss from 1978 partnership operations before considering the special "penalty" gains and losses discussed above. The column headed "Special Allocation of Gain/Loss Operations" refers to the allocation of the special "penalty" gains and losses, and is the allocation in dispute in this case. The column headed "Net Allocation of Gain/(Loss) Operations" is the amount that was included in the total on the Schedules *25 K-1 of the partnership return for the ordinary income or loss from operations for the individual general partners. To the extent this "net allocation" reflects the "special allocation", it is in dispute in this case. The special loss allocation shown on the above table is not in accordance with Russell's November 27, 1978 letter to Tapper. The accountant allocated a "special" loss of $410,495.36 to Russell and $646,632.64 to Monroe. If the special loss allocation had been made in accordance with the letter of November 27, 1978, the loss allocation to Russell would have been 2 X ($300,000 - $148,533.77), or $302,932.46, and the special loss allocation to Monroe would have been 2 X ($300,000 - $61,311.30) or $477,377.40. The special loss allocation to Russell and Monroe thus allocated $276,818.14 more "loss" than would have been allocated if it had been computed in accordance with Russell's letter of November 27, 1978. In 1978, Kearny had an ordinary gain on the sale of the post office building in the amount of $3,326,817.52. Of this ordinary income gain, 50 percent or $1,663,408.76 was allocated to the general partners.The ordinary gain was allocated among the general partners as *26 follows: % OF CAPITAL
ORDINARY
OWNERSHIP OF
INCOME ON
GENERAL
GENERAL
SALE OF
PARTNER
PARTNERS' 50%
BUILDING
Russell
33.33%
$ 554,414.14
Gunter
33.33%
554,414.14
Tapper
15.84%
263,483.95
Ballenger
10.00%
166,340.88
Rosen
7.50%
124,755.66
100.00%
$1,663,408.77
The amounts shown as income or loss on the 1978 schedules K-1 for each of the general partners were as follows: ALLOCATED
ORDINARY
ALLOCATED
ALLOCATED
INCOME FROM
NET ORDINARY
GENERAL
INCOME/(LOSS)
SALE OF
INCOME/(LOSS)
PARTNER
OPERATIONS
BUILDING
ON K-1
Russell
(638,692.96)
+
554,414.14
=
(84,278.82)
Gunter
489,721.57 +
554,414.14
=
1,044,135.71 Tapper
(755,082.99)
+
263,483.95
=
(491,599.04)
Ballenger
293,904.04 +
166,340.88
=
460,244.92 Rosen
(74,510.90)
+
124,755.66
=
50,244.75  Pursuant to the partnership schedule K-1, the Tappers claimed a net ordinary loss of $491,599.04 from Kearny on their 1978 tax returns. Monroe and Estee Tapper claimed $327,733 or two-thirds of this amount and Mayer and Elizabeth Tapper claimed $163,866, or one-third of this amount. The figure of $491,599.04 claimed as net ordinary loss from Kearny was based upon a special loss allocation of $646,632.64. If the special loss allocation had not been made, the Tappers would have had net ordinary income from Kearny's *27 1978 operations of $155,033.61, consisting of the normal allocation of loss from operations of $108,450.34 plus the ordinary income on sale of the building of $263,483.95. For 1978, Kearny had a long-term capital gain on the sale of the post office building in the amount of $3,548,291.23. Of this amount, $2,391,132.14 was allocated to the limited partners and $1,157,159.09 was allocated to the general partners. The capital gain of $1,157,159.09 was allocated among the general partners in accordance with their proportionate ownership of partnership capital. The following table describes the allocation: % OF CAPITAL
OWNERSHIP
GENERAL
OF GENERAL
ALLOCATION OF
PARTNER
PARTNERS' INTEREST *
CAPITAL GAIN
Russell
33.33%
$ 385,681.12
Gunter
33.33%
385,681.12
Tapper
15.84%
183,294.00
Ballenger
10.00%
115,715.91
Rosen
7.50%
86,786.94
100.00%
$1,157,159.09
Kearny's 1978 partnership return shows a net long-term capital gain from dissolution of the partnership in the amount of $448,292.74. As of the end of the calendar year 1978, the accountant *28 for the partnership calculated each general partner's capital account. He calculated the capital account of the Tapper partnership interest as follows: Tapper (15.84% capital ownership of general partners' interest) Capital account as of 1/1/78
($241,235.00)
Capital contribution during
1978
187,790.00 Balance
[4] ($ 53,445.00)
Ordinary loss from operations
in 1978
(755,083.00)
Ordinary income from sale of
facility in 1978
263,484.00 Capital gain on sale of
facility
183,294.00 Capital account as of
12/31/78
($361,750.00)
The Articles of Limited Partnership imposed no obligation on the part of any of the general partners who had negative capital accounts to restore the deficit to the partnership. The accountant for the partnership determined the amount of each general partner's capital gain or loss on dissolution of the partnership as follows: CAPITAL
CAPITAL GAIN/
RESULTING
GENERAL
ACCOUNT
(LOSS) ON
CAPITAL
PARTNER
12/31/78
DISSOLUTION
ACCOUNT
Russell
$141,128.23 ($141,128.23)
0
Gunter
1,059,106.68 (1,059,106.68)
0
Tapper
(361,750.00)
361,750.00 0
Ballenger
383,803.11 (383,803.11)
0
Rosen
(134,159.32)
134,159.32 0
Although the Tappers' 1978 *29 Schedule K-1 (attached to the partnership return) shows a capital gain of $361,750 from dissolution of the partnership, their individual tax returns for 1978 show a total capital gain of $445,083 from Kearny's dissolution. The adjustments shown below were made to the capital gain of $361,750.00 shown on the Schedule K-1 to determine the capital gain upon dissolution as reported on the Tappers' 1978 tax returns: Capital account balance
($361,750.00)
12/31/78
Plus additional cash
contribution
225,000.00 "Amended" capital account
($136,750.00)
Adjustment for 0 basis
acquired from Rubin
- 308,333.00 Balance
($445,083.00)
Gain on Dissolution
445,083.00 Balance The parties agree that Monroe's basis in his partnership interest, rather than the balance of his capital account, should have been used to determine any gain or loss on dissolution of the partnership. The parties are in dispute as to the correct amount of the basis. Monroe's basis in his partnership interest, prior to the sale of the facility, included at least $1,756,552.21 as his share of the secured liability on the post office facility, determined by taking his partnership interest of 7.92% times the balance of $22,178,689.55 due on the *30 mortgage before the sale. When the U.S. Government assumed the mortgage on the post office facility, the partnership was relieved of liabilities in the amount of $22,178,689.55. The Tappers' proportionate share of that liability was $1,756,552.21. OPINION 1. Special Allocation
We must first decide whether the partnership agreement was properly modified to provide for a special allocation of ordinary loss. Petitioners rely upon a letter sent to Monroe by one of the general partners in order to meet their burden of proving that the partnership agreement was modified. The letter was addressed to Monroe, and provided that partners who contributed more than their share of partnership losses would be allocated twice the amount of their excess contributions as ordinary partnership losses. Partners who did not contribute their share would lose twice their share of ordinary losses. The letter concluded by stating: "If your contribution is not remitted in full by December 12, 1978 * * *, I, as general partner will take it as implied consent to the principal [sic] of allocation stated above and will so reallocate partnership operating losses in the 1978 partnership K-1 forms." Section 704(a) *31 [5] provides that "[a] partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement." Section 761(c) provides that a partnership agreement includes any modifications that are agreed to by all the partners, or that are adopted in the manner prescribed by the partnership agreement, if the modifications are made on or before the date on which Federal law requires that the partnership tax return be filed. If the partnership agreement does not provide for the partner's distributive share of income, gain, loss, deduction, or credit, then the partner's distributive share of those items is determined in accordance with his interest in the partnership. Section 704(b)(1). The Articles of Limited Partnership do not specify a procedure for their amendment, other than to state that "[t]hese Articles may not be changed orally." Subsequent amendments to the Articles appear to have been executed by each general and limited partner. The amended articles provide, however, that allocations among *32 the general partners shall be made "in accordance with the definitive written agreement among the general partners." Petitioner has not introduced into evidence a written agreement among the general partners, and thus we do not know how the general partners agreed to allocate items of income and loss among themselves. Nor do we know whether the general partners agreed upon a procedure for modifying such allocation. Because we have not been apprised of the "manner prescribed by the partnership agreement for its modification," section 761(c) permits us to consider only those modifications agreed to by all the general partners. Petitioners have not presented evidence sufficient to satisfy their burden of proving that anyone other than Monroe Tapper ever agreed to the proposed reallocation. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We are asked to infer general agreement from "the entire pattern of behavior" including the accountant's allocations and the schedules K-1 filed. We are informed that "[i]t is *33 very unlikely that these steps would have been taken without the consent of the other general partners, since they were the recipients thereby of substantial ordinary income." We agree that it would have been wise for petitioner and Russell to obtain the agreement of each general partner in order to modify the partnership agreement. We simply have not been presented with "solid evidence" that this happened, however. See Kresser v. Commissioner,54 T.C. 1621, 1629 (1970). The partnership return submitted as evidence was unsigned, and we have no indication that the attached schedules K-1 were ever approved by the affected general partners. Petitioners chose to rest their case upon the stipulations, and thus decided not to elicit the testimony of the other general partners. This Court has previously stated that the failure to produce supporting evidence leads to the inference that such evidence would have been unfavorable, Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947), yet we need not rely upon such an inference to reach our conclusion. As in Kresser v. Commissioner,supra at 1629, we simply have "no confidence whatever in the *34 inferences that petitioners would have us draw," and hold that petitioners have not met their burden of proving that the allocation at issue was agreed to by all the general partners. The parties have agreed as to petitioners' share of partnership items of income in the absence of the special allocation. We therefore do not reach the question of whether the allocation, if agreed to by the partners, would have had substantial economic effect. 2. Character of Gain or Loss Upon Termination of the Partnership.
Petitioners argue that if the special allocation is not given effect, they should be treated as having sustained an ordinary loss upon dissolution of the partnership. In essence, petitioners argue that the sale of the post office (and their consequent release from liability under the mortgage) was unrelated to the subsequent liquidation of the partnership, and therefore that at the time of liquidation their partnership interest was worthless. If they received no distribution upon liquidation, petitioners argue, they should not be treated by section 731(a) as having sold or exchanged their partnership interest, and thus should be entitled to claim an ordinary loss under section *35 165 upon "abandoning" their partnership interest. Respondent maintains that the sale of the post office facility and subsequent liquidation of the partnership were part of an integrated plan of dissolution of the partnership, and thus that any loss realized is capital in nature. We agree with respondent. Section 731 provides that loss recognized by a partner who receives a distribution in liquidation of his partnership interest shall be treated as if it were derived from the sale or exchange of the partnership interest. Section 741 generally treats the sale or exchange of a partnership interest as the sale or exchange of a capital asset. Section 761(d) provides that the term "liquidation of a partner's interest" means "the termination of a partner's entire interest in a partnership by means of a distribution, or a series of distributions, to the partner by the partnership." Section 1.761-1(d), Income Tax Regs., adds that "A series of distributions will come within the meaning of this term whether they are made in one year or in more than one year." Kearny's Articles of Limited Partnership state that the purpose of the partnership was to construct a post office to be leased to the *36 Federal Government. They further provide that the partnership shall terminate upon the written decision of all the general partners to dissolve the partnership, upon not less than three months notice to all of the limited partners. The general partners agreed to make such decision to dissolve and give such notice upon the first to happen of the following events: (1) the termination by the Government of the lease; (2) the expiration of the lease without renewal by the Government; (3) the purchase of the property by the Government; or (4) the sale or other disposition by the partnership of all or substantially all of its interest in the post office facility. Additionally, the partnership agreement provided that upon the dissolution of the partnership as a result of the occurrence of any of the events set forth above, the general partners would proceed to liquidate the partnership. Thus, dissolution was required upon the sale of the post office facility. In August of 1978, Kearny sold the post office facility to the Federal Government. On August 28, 1978, Kearny's general partners notified the limited partners that the partnership would be dissolved as of December 27, 1978. The partnership *37 was in fact dissolved on or before December 31, 1978. From these facts it becomes clear that the sale of the post office resulted in a distribution to petitioner in complete termination of his partnership interest. The building was the only asset the partnership owned. What remained to be done and what was required to be done after the building was sold was simply to wind up the affairs of the partnership before terminating it. Thus, when the building was sold, petitioner received a distribution (in the form of relief from liability) of his share of the assets of the partnership. Because we view the sale of the facility and the subsequent liquidation of the partnership as steps in an integrated transaction, this case is governed by section 731(a)(2), which provides that loss may be recognized by a partner who receives a distribution in liquidation of his partnership interest, if the distribution consists solely of, interalia, "money." Section 752(b) provides that any decrease in a partner's share of liabilities of a partnership shall be considered as a distribution of money to the partner by the partnership. Thus, the purchaser's assumption of the mortgage on the postal facility *38 is treated as a distribution of money to petitioner to the extent of his proportionate share of partnership liabilities. To the extent that his basis in his partnership interest exceeds the amount of this deemed distribution, petitioner is entitled to claim a loss. The character of the loss is governed by sections 731(a) and 741, which provide that the loss is considered to have been derived from the sale or exchange of the partner's interest in the partnership, a capital asset. [6]
This case is similar to Pietz v. Commissioner,59 T.C. 207 (1972), in which we held that the sale of a motel, with application of the sales proceeds to a mortgage on the property, was integral to the termination of the partnership. See also O'Brien v. Commissioner,77 T.C. 113 (1981); Stilwell v. Commissioner,46 T.C. 247 (1966). Petitioners attempt to distinguish Pietz by arguing that there was no factual reason in Pietz to treat the sale and distribution as separate transactions, because nothing remained to be done after the motel was sold. In their case, petitioners argue, the partnership needed to acquire *39 additional assets after the sale in order to satisfy partnership liabilities. Respondent submits, and we agree, that this point has little significance. Most businesses require time to wind up their affairs after liquidating their assets. After the sale, additional capital was needed in order to satisfy other partnership liabilities before dissolution. The need was part of the normal process of terminating a business venture. Neither the partnership provisions nor the corporate provisions35 of the Internal Revenue Code contemplate simultaneous liquidation and dissolution. See sections 337; 761. Indeed, section 1.761-1(d), Income Tax Regs., brings within its reach a series of liquidating distributions, even when the distributions span more than one year. Compare section 337, which allows a corporation 12 months to liquidate its assets after adopting a plan of complete liquidation. The record in the instant case satisfies us that the sale of the post office facility was part of the process of partnership termination, and we therefore are convinced that the transaction should be governed by section 731. Petitioners also argue that upon sale of the facility they were not released from *40 liability, but rather increased their share of liabilities by contributing additional cash to the partnership. We have previously rejected similar arguments. In O'Brien v. Commissioner,supra at 118, we stated that a partner's "abandonment of his partnership interest resulted in a decrease in his share of the partnership liabilities within the meaning of section 752(b), not because he ever had personal liability under State law, but because he is no longer considered under the applicable Code provisions as sharing in the nonrecourse liabilities of the partnership." In Stilwell v. Commissioner,supra at 251, we stated that "[s]ince a partner's share of the partnership liabilities is added to the basis of his partnership interest, it necessarily follows that an assumption of that share * * * must constitute a distribution * * *. Otherwise, a partner would have a loss which would at least in part be fictitious in the event of the disposition of his partnership interest." The same principle applies here. [7] *41 3. Amount of Gain or Loss Upon Termination of the Partnership
The parties agree that petitioners' basis in their partnership interest should be used to determine any gain or loss upon dissolution of the partnership.They disagree as to the amount of basis in the Tapper partnership interest. Respondent sets forth a detailed series of calculations and concludes that the basis in the Tapper partnership interest was $1,958,102 before the liquidating distribution (in the form of release from liabilities) of $1,756,552. Thus, respondent concludes, petitioners' capital loss on dissolution amounted to $201,550. Petitioners set forth a different series of calculations, and conclude that their loss upon Kearny's termination amounted to $751,118. In essence, the parties' different approaches raise two issues: (1) whether petitioner's basis should be assumed to have been zero on January 1, 1978, before the transactions in question occurred, and (2) whether the basis should be reduced by the value of a zero-basis partnership interest acquired from another partner, Rubin. With respect to the first issue, petitioners argue that we should assume a basis of *42 zero before taking into account the 1978 transactions. They base their position upon section 705(a)(2), which provides that the tax basis of a partnership interest may not be adjusted below zero, and upon Falkoff v. Commissioner,62 T.C. 200, 209 (1974), in which we stated that "section 705(a)(2) precludes the use of a beginning figure less than zero." Upon closer examination, however, it becomes clear that petitioners do not actually assume a starting basis of zero, but rather assume a starting basis of $1,756,652.21, petitioners' share of the mortgage on the post office facility. Petitioners state the following on brief: Although their capital account had a negative balance ($241,235) as of January, 1, 1978 * * *, the tax basis of a partnership interest may not be adjusted below zero. Section 705(a)(2). The basis of their interest as of January 1, 1978 would have reflected the interest's share of liabilities, particularly of the secured debt which was $22,244,227 as of January 1, 1978. * * * However, since this liability was removed when the property was sold, there was a corresponding reduction of basis during the year. This makes it reasonable, in reconstructing basis, simply *43 to assume a zero basis for 1978 and then to calculate the effect of the year's transactions on that zero basis. In calculating "the effect of the year's transactions on that zero basis," petitioners did not include a distribution of $1,756,652.21 to account for their release from liability upon sale of the building. In effect, petitioners argue that the beginning figure should include petitioners' share of liabilities ($1,756,652.21) but should not be reduced by the negative capital account, even though the resulting starting figure would remain positive. Petitioners' approach is required neither by section 705(a)(2), nor by Falkoff v. Commissioner,supra.
Section 705(a) sets forth the general rule for determining a partner's basis in his partnership interest. [8] *44 Section 752(a) treats the partner's assumption of a partnership liability as a cash contribution, and his basis is adjusted upward accordingly. Section 705(a)(2) prohibits reduction of a partner's basis below zero. A partner is not entitled to deduct his share of partnership losses if those losses exceed his basis in his partnership interest, section 704(d), and a partner is taxed on distributions of money he receives to the extent that those distributions exceed his basis in his partnership interest. Section 731(a)(1). Thus, it would be inconsistent, when calculating basis in this case, to assume a starting basis of less than zero, because any amounts previously distributed to petitioner in excess of his basis would have been taxed previously. This is not true as to capital account, however. The capital account generally reflects a partner's equity investment in the partnership. Among other things, petitioner's capital account does not reflect his share of partnership liabilities. Thus, it is possible for a partner, like petitioner in this case, to have a negative capital account while maintaining a positive tax *45 basis in his partnership interest. [9] It is possible to calculate a partner's basis in his partnership interest by making adjustments to his capital account. [10] *47 A negative capital account does not necessarily reflect distributions that have already been taxed. Thus, it would not be unfair to start with the figure from a negative capital account, and to adjust it for partnership liabilities and other differences in order to arrive at a starting basis, so long as the resulting starting basis is a positive number. If a partner had a negative capital account at the beginning of a taxable year, *46 and if all appropriate basis adjustments resulted in a negative basis on the first day of a taxable year, that basis should be adjusted to zero to reflect amounts that would have been taxed in prior years. In the instant case, however, the procedure we use results in a positive number. This approach is not prohibited by section 705(a)(2), nor has it been rejected in Falkoff v. Commissioner,supra. Both authorities prohibit the use of a negative basis in a calculation; neither prohibits the use of a negative capital account in order to derive a starting basis if, when adjusted properly, it results in a positive starting basis. In order to determine petitioners' basis in their partnership interest as of January 1, 1978, we therefore begin with the capital account of -$241,235. To this we add petitioners' share of partnership liabilities, or $1,756,552.21. The record contains no evidence that adjustments are necessary due to contributions initially entered on the partnership's books at other than their tax basis, differences between the financial and tax accounting treatment of partnership income or expense items, or partnership losses (before the year in issue) not previously deductible by reason of section 704(d). An adjustment is required, *48 however, for the retirement of Seymour Rubin's partnership interest in 1971. The parties agree that upon Rubin's termination, the capital accounts of the other partners were increased, and that petitioners' capital account was increased by $308,333. Petitioner concedes on brief that "[i]f we were working from capital account to basis, an adjustment would have to be made at this point, reducing the capital account by $308,333 because nothing was paid for this interest." We agree that subtraction of $308,333 is appropriate. Upon Rubin's retirement, the interests of the remaining partners increased proportionately, and their capital accounts were properly adjusted to reflect this fact. Their tax bases, however, would not have increased. We must therefore subtract the amount of $308,333 from capital account to calculate basis. The following table summarizes our calculations: Capital account balance
as of 1/1/78
$ (241,235)
Petitioners' share of
partnership liabilities as
of 1/1/78
1,756,552 Adjustment for increase to
capital account upon Rubin's
termination
(308,333)
Basis as of 1/1/78
$1,206,984 The following adjustments to the above starting basis should be made in order to reflect the events *49 of 1978 and to determine petitioners' loss upon liquidation of the partnership: Basis as of 1/1/78
$1,206,984 Capital contribution during
1978
187,790 Capital contribution of
December 26, 1978
[11] 225,000 Capital gain on sale of
facility in 1978
183,294 Ordinary income from sale of
facility in 1978
263,484 Ordinary loss from operations
in 1978 (disregarding special
allocation)
(108,450)
Basis before distributions
$1,958,102 Distribution on dissolution
(decrease in liabilities)
[12] 1,756,552 Petitioners' loss on dissolution
$ 201,550  Petitioner is therefore entitled to deduct *50 a capital loss pursuant to the above calculation and as modified by fn. 11. Decisions will be entered under Rule 155.
Footnotes
1. Any reference to the Rules is to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The stipulation, in what appears to be a typographical error, reports the gross purchase price at $26,501,556.43.↩
3. The exhibit, apparently due to a typographical error, reports this figure at $23,162.32.↩
*. The general partners had a 50% ownership in the entire partnership. The percentages shown here are of the general partners' 50% interest rather than of the entire partnership.↩
4. The exhibit, apparently due to a typographical error, reports this figure at $54,446.00.↩
5. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
6. The parties have not argued that any of the exceptions to section 741↩ are applicable in this case.
7. Tejon Ranch Co. v. Commissioner,T.C. Memo. 1985-207, does not apply to the instant case. In Tejon Ranch Co., the parties were not relieved from liabilities, and thus the provisions of section 731(a)(2)↩ were not triggered.
8. "This general rule is historical in approach, commencing with the partner's initial basis for his interest and taking into account all subsequent contributions by the partner to the partnership, distributions from the partnership to the partner, and the partner's shares of taxable and nontaxable income and expense of the partnership, up to the date as of which the partner's basis is to be determined." McKee, Nelson, and Whitmire, Federal Taxation of Partnerships and Partners,↩ par. 6.02[1].
9. Unlike a partner's basis, which can never be less than zero, a partner's capital account will be negative if the sum of the capital contributions credited to him on the partnership's books and his share of "book" profits is less than the sum of the amounts distributed to him and his share of book losses. Negative capital accounts are common in real estate ventures, where the use of borrowed funds may permit deductible start-up costs and accelerated depreciation in the early years of the venture to exceed a partner's capital contribution. * * * [McKee, Nelson, & Whitmire, supra↩ at par. 6.05[1].]
10. McKee, Nelson, & Whitmire, supra at par. 6.05 [7] suggest the following procedure for the calculation: Capital Account Calculations to Determine Basis
The relationships discussed here lead to a method by which a partner's basis for his partnership interest may be calculated by using his capital account, determined from the partnership's financial accounting records, as the starting point, and making the following adjustments: (1) Increase the capital account by the partner's share of partnership liabilities. (2) Adjust the capital account for any contributions initially entered on the partnership's books at other than their tax basis. (3) Adjust the capital account for any revaluations of partnership assets in connection with admissions of new partners, sales or retirements of partnership interests, or distributions of partnership assets. (4) Adjust the capital account for any differences between the financial and tax accounting treatment of partnership income or expense items. (5) Increase the capital account by the total of the partner's share of any partnership losses not previously deductible by reason of section 704(d).↩
11. Monroe also assumed $75,000 of partnership liabilities. The parties have stipulated that the Tappers deducted as an ordinary expense "some of the $75,000" of liabilities assumed when they paid the creditors. To the extent that a portion of the $75,000 was not deducted, it should be added to petitioners' basis, and will increase petitioners' loss. ↩
12. Respondent's calculations did not reflect other partnership liabilities that may have been assumed and we therefore do not consider their effect. In any event, additional liabilities would have resulted in a greater starting basis and would have washed with any deemed distribution.↩